| | |
|---|---|
| CONSOLIDATED SALMONID CASES | 1:09-CV-01053 OWW DLB |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. LOCKE, *et al.* | MEMORANDUM DECISION AND ORDER RE PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER |
| STOCKTON EAST WATER DISTRICT, *et al.* v. NOAA, *et al.* | |
| STATE WATER CONTRACTORS v. LOCKE, *et al.* | |
| KERN COUNTY WATER AGENCY, *et al.* v. UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| OAKDALE IRRIGATION DISTRICT, *et al.* v. UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| METROPOLITAN WATER DISTRICT OF CALIFORNIA v. NATIONAL MARINE FISHERIES SERVICE, *et al.* | |

Plaintiffs, San Luis & Delta Mendota Water Authority (the "Authority") and Westlands Water District ("Westlands"), move for a Temporary Restraining Order ("TRO") against the implementation of Reasonable and Prudent Alternative ("RPA") Action IV.2.3 set forth in the National Marine Fisheries Service's ("NMFS") June 4, 2009 Biological Opinion ("2009 Salmonid BiOp"), which addresses the impacts of the coordinated operations of the federal Central Valley Project ("CVP") and State

Water Project ("SWP") on the Central Valley winter-run and spring-run Chinook salmon, Central Valley steelhead, Southern Distinct Population Segment of Green Sturgeon, and Southern Resident Killer Whales ("Listed Species"). Doc. 164, filed Jan. 27, 2010.  San Luis and Westlands concurrently filed a motion for preliminary injunction raising additional grounds for enjoining Action IV.2.3. Doc. 164.

Plaintiffs State Water Contractors; Metropolitan Water District of Southern California; and Kern County Water Agency and Coalition for a Sustainable Delta joined the TRO motion.  Docs. 177, 179 & 181.  Plaintiffs Oakdale Irrigation District, et al., and Intervenor California Department of Water Resources ("DWR"), the operator of the SWP, filed statements of non-opposition. Docs. 180 & 185.  Federal Defendants and Defendant Intervenors opposed.  Doc. 190 & 187.

The TRO motion came on for hearing February 2, 2010, on shortened notice, in Courtroom 3 of the above-captioned Court.  The parties were represented by counsel, as noted in the record in open court.

## I. <u>BACKGROUND</u>

Plaintiffs seek temporary injunctive relief on the grounds that:

(1) the 2009 Salmonid BiOp is arbitrary, capricious, and contrary to law because:

    (a) NMFS allegedly conducted an effects analysis that improperly overstates impacts attributable to the coordinated operations of the CVP and SWP;

    (b) NMFS failed to clearly define or consistently apply a relevant environmental baseline;

    (c) NMFS failed to distinguish between discretionary and non-discretionary CVP and SWP activities, which overstated the effects of coordinated operations of the Projects;

    (d) RPA Action IV.2.3 is arbitrary and capricious, because it is without factual or scientific justification and/or is not supported by the best available science; and

(2) NMFS and the United States Bureau of Reclamation ("Reclamation") failed to comply with the National Environmental Policy Act ("NEPA") in issuing and implementing the 2009 Salmonid BiOp.

Plaintiffs further claim that the implementation of Action IV.2.3 will cause them continuing irreparable harm and that the public interest and balance of hardships

favor injunctive relief.

## II. <u>STANDARDS OF DECISION</u>

A.   <u>Temporary Restraining Order.</u>

Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded as of right." *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 376 (2008); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The standard for relief applicable to a temporary restraining order is the same as for a preliminary injunction.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

Four factors must be established by a preponderance of the evidence to qualify for temporary injunctive relief:

1.   Likelihood of success on the merits;

2.   Likelihood the moving party will suffer irreparable harm absent injunctive relief;

3.   The balance of equities tips in the moving parties' favor; and

4.   An injunction is in the public interest.

*Winter*, 129 S.Ct. at 374; *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

4

B.  __Balancing of the Harms in ESA Cases.__

The Supreme Court held in *TVA v. Hill,* 437 U.S. 153, 194 (1978), that Congress struck the balance in favor of affording endangered species the highest of priorities. In adopting the Endangered Species Act ("ESA"), Congress intended to "halt and reverse the trend toward species' extinction, __whatever the cost__." *Id.* at 184 (emphasis added). *TVA v. Hill* continues to be viable. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 664, 669-71 (2007); *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496-97 (2001); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n.9 (1987).

*Winter* does not modify or discuss the *TVA v. Hill* standard.[1] Although *Winter* altered the Ninth Circuit's general preliminary injunctive relief standard by making that standard __more rigorous__, *Winter* did not address, let alone change, the Circuit's approach to the balancing of hardships where endangered species and their critical habitat are jeopardized. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1169 (9th Cir. 2002) (Congress removed the courts' traditional equitable discretion to balance parties' competing interests in ESA injunction

---

[1] Although *Winter* involved ESA-listed species, the Winter decision only addressed claims under NEPA.

proceedings); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994)(same).

Two post-*Winter* district court cases declined to balance the equities in evaluating requests for injunctive relief under the ESA, applying *TVA v. Hill's* reasoning. *Oregon Natural Desert Ass'n v. Kimbell*, 2009 WL 1663037, at *1 (D. Or. June 15, 2009); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 105-106 (D. Me. 2008).

*TVA v. Hill* and related Ninth Circuit authorities foreclose the district court's traditional discretion to balance equities under the ESA. However, there is no such bar in NEPA injunction proceedings. This case is at the intersection of ESA and NEPA law, requiring consideration of more than the ESA.

C.   <u>Administrative Procedure Act.</u>

The Administrative Procedure Act ("APA") requires Plaintiffs to show that NMFS's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

1.   <u>Deference to Agency Expertise.</u>

The Court must defer to the agency on matters within the agency's expertise, unless the agency completely failed to address some factor, consideration of which was

6

essential to making an informed decision. *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005). The court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *River Runners for Wilderness v. Martin*, --- F.3d ---, 2010 WL 337337 *4 (9th Cir. June 10, 2009).

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action ... need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*Id.*

　　2.　**Record Review.**

A court reviews a biological opinion "based upon the evidence contained in the administrative record." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1245. Judicial review under the APA must focus on the administrative record already in existence, not some new record made initially in a reviewing court. Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980).

Exceptions to administrative record review for

7

technical information or expert explanation make such
evidence admissible only for limited purposes, and those
exceptions are narrowly construed and applied. *Lands
Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).
"Although [any] factual inquiry is to be 'searching and
careful' the ultimate standard of review is narrow.  The
court is not empowered to substitute its judgment for
that of the agency." *Asarco, Inc. v. EPA*, 616 F.2d 1153,
1159 (9th Cir. 1980).  Federal Courts cannot routinely or
liberally admit new evidence in an APA review case,
because "[w]hen a reviewing court considers evidence that
was not before the agency, it inevitably leads the
reviewing court to substitute its judgment for that of
the agency." *Id.* at 1160.

    3.  <u>Best Available Science.</u>

What constitutes the "best" available science
implicates core agency judgment and expertise to which
Congress requires the courts to defer; a court should be
especially wary of overturning such a determination on
review. *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense
Council*, 462 U.S. 87, 103 (1983) (a court must be "at its
most deferential" when an agency is "making predictions
within its area of special expertise, at the frontiers of
science").  An agency has wide discretion to determine

the best scientific and commercial data available for its decision-making.  *See S.W. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 n.5 (9th Cir. 1998).  A decision about jeopardy must be made based on the best science available at the time of the decision; the agency cannot wait for or promise future studies.  *See Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002).

### III. <u>ANALYSIS</u>

**A.   <u>Timely Application for Relief.</u>**

The Court analyzed and decided Federal Defendants' and Defendant Intervenors' objections to temporary injunctive relief  based on lack of timeliness or undue delay pursuant to Eastern District of California Local Rule 65-221(b), and overruled those objections for the reasons stated in open court, which are by this reference incorporated.

The essential reason for hearing the TRO motion on shortened time was that unexpected storm events in January and February 2010 have made and are likely to continue to make available a potential source of water that could enhance CVP and SWP supply, but which will be "lost" unless captured within days of the storms' occurrence.  This urgency, in view of the harm alleged to

be visited upon all Plaintiffs and the human environment, including job losses, dislocation of farm workers and other residents, lowering of the tax base, and prejudice to community services and schools; land fallowing and probable related adverse effects on air quality; overdrafting of groundwater with resulting land subsidence and adverse effects on water quality; as well as likely rationing of municipal water required for public use, justify the hearing and decision on these motions.

Defendants also successfully objected to Plaintiffs' attempt to incorporate by reference in the TRO motion, all the voluminous papers filed in support of Plaintiffs' pending motions for preliminary injunction. Based on the short time for a response (three and one-half days, including two weekend days) afforded to Defendants and Defendant-Intervenors, it is unreasonable to expect complete and comprehensive responses to expedited motions, supported by complex legal and factual authority that have been months in and for which preparation continues for a hearing at least 30 days away. The TRO motions can be decided without detailed consideration of the arguments raised only in the preliminary injunction papers.

B.   <u>Likelihood of Success on the Merits.</u>

    1.   <u>ESA Claims.</u>

    Plaintiffs' TRO motion focuses on the argument that they are likely to succeed on their ESA claim that the 2009 Salmonid BiOp is arbitrary, capricious, and contrary to law because the bases provided in the record for RPA Action IV.2.3 are without factual or scientific justification and/or are not supported by the best available science.[2]  Action IV.2.3 limits Old and Middle River ("OMR") reverse flows to levels no more negative that -2,500 to -5,000 cubic feet per second ("cfs"), depending on entrainment levels.  2009 Salmonid BiOp at 648.  The Action begins on January 1, and ends on June 15 or when the average daily water temperature at Mossdale is greater than 72°F (22°C) for one week, whichever occurs first.

    Plaintiffs maintain that NMFS based its rationale for imposing this OMR negative flow restriction on outputs from computer model runs utilizing the so-called Particle Tracking Model ("PTM") which models the flow of inert particles as they move within a flowing body of water.  A primary source on which the 2009 Salmonid BiOp relies to

_____

[2] Plaintiffs incorporate by reference additional arguments from the preliminary injunction brief concerning the 2009 Salmonid BiOp's effects analysis and baseline description.  However, as discussed above, Federal Defendants and Defendant Intervenors did not have an adequate opportunity to respond to these incorporated arguments.

justify application of the PTM, is a 2008 study by
Kimmerer & Nobriga.  *See* AR 00122250.  Plaintiffs point
to express disclaimers in that study which suggest that
PTM is not an ideal method for modeling salmonid smolts,
which have "complex behaviors and are strong swimers."
AR 00122263.

However, Kimmerer and Nobriga conclude that PTM
results "should be included in the design and analysis of
future studies" of salmon survival rates.  *Id.*  The 2009
Salmonid BiOp states that its analysis of flows and
entrainment risk used the output of PTM simulations along
with other evidence from salvage data, as well as mark
and recapture studies, to reach conclusions about the
relationship between reverse flows and entrainment.  2009
Salmonid BiOp at 380-81.  Plaintiffs' suggestion that
NMFS relied exclusively on the PTM studies to justify
Action IV.2.3 is directly contradicted by Federal
Defendants' expert.  *See* Doc. 190-4, Stuart Decl., at ¶8,
who describes other factors considered.  On the present
record, without further factual development, there is a
scientific dispute that prevents the Court substituting
its judgment for a finding that NMFS's reliance on the
PTM is unlawful, as it was neither clearly erroneous for
the PTM to have been utilized, nor was PTM the exclusive

12

justification for Action IV.2.3.  Plaintiffs have not yet established a likelihood of success on their ESA claim.[3]

2.  NEPA Claim.

In the Delta Smelt Consolidated Cases, it has been decided that Reclamation, as the action agency, violated NEPA by failing to follow the prescriptions and requirements of NEPA in connection with the implementation of the RPAs prescribed by the 2008 Delta Smelt BiOp.  *See* 1:09-cv-00407, Doc. 399 ("Delta Smelt NEPA Decision").  For reasons stated in the Delta Smelt NEPA Decision and which will be stated in a written decision to be issued in connection with the parallel cross motions for summary judgment on NEPA issues in these Consolidated Salmonid Cases, Reclamation has likewise violated NEPA by its total failure to in any way comply with NEPA in connection with its implementation of the 2009 Salmonid BiOp RPAs.

The United States' failure to comply with NEPA has, at the very least, prevented the required reasonable evaluation, analysis, "hard look at," and disclosure of the costs of implementing the 2009 Salmonid BiOp RPAs to human health and safety, the human environment, and other environments not inhabited by the Listed Species.

_____

[3] This is not meant to prejudge the disposition of this issue in future proceedings.

C.   **Irreparable Harm.**

　　1.   **Irreparable Harm to Plaintiffs.**

The district court may consider a wide range of evidence of harm in a NEPA injunction proceeding.  Here, it is undisputed that, as a result of storm events in late January 2010, Action IV.2.3 began to control operations by way of its automatic imposition of a -5000 cfs ceiling on reverse OMR flows.  Plaintiffs estimate that for every day that Action IV.2.3 controls by imposing a -5000 cfs limit (as opposed to a more restrictive limit based in entrainment triggers), Reclamation's pumping output is reduced by 500 cfs per day (or approximately 27,000 acre-feet of water over a four week period).  Doc. 166, Boardman Decl., at ¶16.

DWR's pumping output is also reduced when Action IV.2.3 is controlling.  Doc. 78, Erlewine Decl., at ¶¶ 4-5.  Mr. Erlewine estimates that losses to the combined Projects between January 20 and January 26, 2010 exceeded 90,000 AF, while combined losses from January 27 through February 5, 2010 may exceed 100,000 AF.  *Id*.  Although Federal Defendants' note that "it is difficult to quantify the magnitude and duration of this reduction given changing river flows, weather conditions, and possible delta smelt actions," the United States does not attempt to directly refute Plaintiffs' figures.  *See* Doc.

**14**

190-3, Milligan Decl., at ¶¶ 10-11.  Even assuming, arguendo, the estimates provided by Boardman and Erlewine are so excessive that they double actual loss, the figures are still significant.

It is undisputed that every acre-foot of pumping that is foregone during this time of year is an acre-foot that does not reach the San Luis Reservoir where it can be stored for future delivery to users during times of peak demand later in the water year.

It is recognized that reduced deliveries caused by the 2009 Salmonid BiOp make up only a portion (the parties disagree as to the magnitude) of overall delivery reductions, to which severely dry hydrologic conditions and other legal constraints have and will continue to contribute.  However, it is also undisputed that any lost pumping capacity directly attributable to the 2009 Salmonid BiOp will contribute to and exacerbate the currently catastrophic situation faced by Plaintiffs, whose farms, businesses, water service areas, and impacted cities and counties, are dependent, some exclusively, upon CVP and/or SWP water deliveries.  The impacts overall of reduced deliveries include irretrievable resource losses (permanent crops, fallowed lands, destruction of family and entity farming

businesses); social disruption and dislocation; as well as environmental harms caused by, among other things, increased groundwater consumption and overdraft, and possible air quality reduction.

    2.   <u>Potential Harm to the Listed Species.</u>

An injunction should not issue where "enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources." *Save Our Ecosystems*, 747 F.2d 1240, 1250 n.16 (9th Cir. 1984). The crux of Plaintiffs' request for relief is their contention that the Listed Species are not now present in the vicinity of the pumps in any significant numbers.  As is the endemic condition of these cases, the data is sparse and usually unreliable.

The government's expert, Mr. Stuart, estimates that for 2009, 4,416, adult winter-run Chinook salmon (including 416 hatchery fish) returned to the streams and rivers of the Central Valley to spawn.  Stuart Decl. at ¶3.  This represents an increase over the adult escapement estimate of 2,850 fish in the 2008 water year. *Id*.  Based on fecundity and sex ratio from the 2008 cohort, Mr. Stuart calculated a 2010 water year juvenile production estimate ("JPE") of 1,144,860 juvenile winter-run Chinook.  *Id*.  Applying the BiOp's 2% Incidental Take

Limit for juvenile winter-run, that limit is 22,897.  *Id.*

At this time, the government offers no population estimates for spring-run juveniles, steelhead smolts or green sturgeon that are comparable to the winter-run JPE estimates, nor does it provide any quantitative population measure in locations of concern whatsoever.

According to Reclamation's own salvage records, approximately 920 tagged winter-run and 234 non-tagged winter-run, for a total of 1,154 fish, were salvaged in January 2010.  *See* Doc. 189, Defendant Intervenors' Request for Judicial Notice, Exhibit 3 (Central Valley Operations Office Chinook Salmon Report, January 2010) & Doc. 189-11 (Obeji Decl.).  This constitutes approximately five percent (5%) of the total incidental take limit, or approximately one tenth of one percent (0.1%) of the total JPE.[4]

Mr. Stuart opines that approximately 6.8 percent of all winter-run salvage normally occurs during December; 13.9 percent in January; 25.6 percent in February; and 50 percent in March; with the remaining 2-3 percent

---

[4] Plaintiffs' counsel questioned whether winter-run were actually present in salvage at all, suggesting fall and late-fall run Chinook salmon are the only species that could possibly be showing up as tagged fish in salvage.  Counsel produced no competent evidence that Reclamation's records are incorrect.  Nevertheless, even assuming that all 1,154 fish counted as winter-run are actually winter-run, the amount of actual salvage measured in the month of January is negligible.

occurring during April, May and June.  Stuart Decl., at
¶4 & Exh. 1b.  Rough extrapolating from this information
shows that, if 1,154 fish constitute 13.9 percent of the
salvage to be expected for the remainder of the year, the
total salvage for the year would be approximately 8,300
winter-run juveniles, approximately 36% of and well below
the Take Limit.

Less than 1% of spring-run Chinook will have moved
through the Delta by the end of February, while
approximately 17% of the spring-run population will move
through by the end of March (0.1% in January, 0.2% in
February, and 17% in March).  *Id.*  It is highly unlikely
that Project pumping operations will have any effect on
spring-run through the month of February.

There are no population estimates for Steelhead, yet
Mr. Stuart estimates that 58% of the steelhead population
will have moved through the Delta by the end of February
as measured by raw loss counts at the facility.  This
will rise to 90% by the end of March.  *Id.*  He
specifically estimates 37% of the species will move
through the Delta in February.  *Id.*  Salvage and loss of
Steelhead prior to the January precipitation event has
been very low.  See *id.* at ¶6.

Members of the Southern Distinct Population Segment

("SDPS") of North American Green Sturgeon are present within Delta waterways throughout the year. Mr. Stuart estimates that approximately 16% of Green Sturgeon salvage will occur between January and the end of March, with 6% in February followed by 8% in March. *Id.* at ¶5. Salvage is typically higher at the SWP during this period. *Id.* However, there are no finite population data nor any indexed salvage estimates for SDPS Green Sturgeon and the Court cannot find that the requested injunctive relief will threaten that species or its critical habitat.

As to the Southern Resident Killer Whale, whose preferred prey are Fraser River salmon, there is no evidence that the contemplated injunctive relief, which would operate, at the most, only through February, the period during which a temporary restraining order is authorized by law (28 days) would have any effect on the Orca.

D.   Balancing of the Harms/Public Interest.

The threat of jeopardy to any of the Listed Species by enjoining the operation of Action IV.2.3 appears minimal under the now-existing conditions. On the other hand, the harm to Plaintiffs is substantial and irreparable, because the storm events that are now

19

occurring and predicted to occur in the next few days in San Joaquin/Sacramento watershed will provide potential water supplies for storage in the San Luis Reservoir that cannot be replicated and will not recur.

### IV.  CONCLUSION

If Reclamation had provided the required NEPA analysis, it could have analyzed and evaluated not only the protection of the species and their habitat, but whether less harmful, protective, reasonable and prudent alternatives could have been adopted that also protect humans and the human environment.  No consideration was given to measures that were not more protective than necessary and which would have afforded additional water supply to water districts, water users, and communities affected by continuing drought conditions and water shortages.

The evidence establishes that CVP water not pumped for diversion to the San Luis Unit flows through the Delta and out to the ocean.  To preserve, for beneficial use, such water is in the public interest, and protection of human health, safety and the affected communities also serves the public interest.  The injury to Plaintiffs is irreparable and a temporary restraining order is justified as the balance of hardships, at this point in

time, tips decidedly in Plaintiffs' favor.  It is significant that DWR, the co-operator of the Projects, does not oppose this relief.

Given Federal Defendants' failure to abide by NEPA's requirement that it take a hard look at the broad array of potential impacts to the environment (human and otherwise) caused by implementation of the 2009 BiOp's RPAs, enjoining implementation of a measure, RPA Action IV.2.3, that is causing irreparable harm to the human environment served by the Plaintiff water agencies is justified, so long as jeopardy to species and their critical habitat and/or adverse modification does not occur.

As time passes and March approaches, according to the Stuart Declaration, more significant potential harm to the species may occur.  The storms are occurring now. That water will not otherwise be preserved.  The record does not clearly predict how salvage rates may change if negative flows exceed -5,000 cfs in February.  As a result, the temporary restraining order, which shall issue shall initially be for a period of fourteen (14) days, subject to a renewal by Plaintiffs upon an affirmative showing that neither the species' nor their critical habitat will be jeopardized by continued

injunction of RPA Action IV.2.3.

The Court in enjoining application of RPA Action IV.2.3, otherwise defers to the agency's (Reclamation) discretion to conduct Project operations. This Temporary Restraining Order shall issue without prejudice to Defendants' future showing that conditions have changed relative to jeopardy to the species and their habitat.

No party has offered comment or evidence on the issue of bond. Because this case involves the management of public resources, wholly under the control of the action agency, Reclamation, and because the injunctive relief is of limited duration, Plaintiffs shall post a bond in the amount of $5,000 to secure the relief provided by law in the event it is determined injunctive relief was improvidently issued.

<u>ORDER</u>

1. The United States Department of the Interior and its Bureau of Reclamation and the National Marine and Fisheries Service, and all those acting for, under or in concert with them, shall be and are hereby restrained and enjoined from implementing Action IV.2.3 of the the 2009 Salmonid Biological Opinion RPA;

2. Plaintiffs shall post a bond in the amount of $5,000;

1      3.   This Temporary Restraining Order is issued

2  without prejudice to Defendants' showing changed

3  conditions that threaten jeopardy to the species and

4  their critical habitat.

5

6  SO ORDERED
   Dated: February 5, 2010
7
                                  /s/ Oliver W. Wanger
8                                 Oliver W. Wanger
                              United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28